# EXHIBIT A

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Patent Application of: Williams
U.S. Patent Application No.: 11697294
Application Date: April 5, 2007
Title: Bicycle Carrier

Affidavit of Copying under Rule 716.06

I, Marty L. Williams, declare as follows:

1. I am the inventor of the technology contained in issued Patent 684,917 and described in pending patent applications 11/697294, 29/454,713, 29/459,234 and 29/459,230.

2. I hold a Bachelors of Science degree in Business from the University of South Dakota.

3. I founded Let's Go Aero, Inc. (LGA) in 1998 and am its CEO and primary inventor.

4. I am the inventor on well over 20 patents, patent applications, approximately 10 trademarks and numerous copyrights. Inventions of mine have won the GMC Best Professional Grade award for new inventions in the automotive industry twice, and the Best Engineered New Product award in the automotive industry once.

5. April 5, 2007. I invented the '294 technology over 10 years ago, perfected the invention and filed the initial utility patent application on April 5, 2007.

6. November, 2007. The '294 invention was introduced by LGA at the November, 2007 Specialty Equipment Manufacturing Association "SEMA" Show in Las Vegas, NV and was acclaimed and pursued for licensing immediately by the four largest bike rack manufactures in the world. Images in exhibits.

7. January 2, 2008. Let's Go Aero, Inc. (LGA) signed an exclusive license (exhibit below) for commercialization of '294 with Cequent Group, the world's largest manufacturer of towing equipment, on Jan. 2, 2008. Parties to this agreement were Ed Swartz, Tom Benson and Paul Caruso,

and the licensing agreement was drafted by David Cupar, attorney with McDonald, Hopkins. LGA received over $500,000 for these licensing rights. During 2008 and 2009, LGA assisted in finalizing the ‘293 product for commercial sales. The formerly licensed SportWing 2 and 4 bike carriers and the NV-2 bike carrier were designed during the first half of 2008 and remain unchanged. My extensive involvement in creating the SportWing and NV-2 racks is reflected in my sobriquet for the product, Pixie, being adopted by Cequent after the original license was signed by Paul Caruso on January 2, 2008, for the subsequent final design phase of the SportWing and NV-2 product, to wit; my original files and images from conception of the invention are titled “Pixie”; the ‘294 application was filed with attorney docket description “LG- Pixie” on April 4, 2007; in “Exhibit A” of the January 2, 2008 Original License under Paul Caruso’s signature ‘294 shares the title “Pixie”, and the Title of three attached Cequent initial bike rack planning documents read “Cequent Pixie Bike Rack Ideation” January 21, 2008, “Pixie mechanism ideation” January 28, 2008 and “Rola V2 Bike ”(subtitled “Pixie”) February 21, 2008, demonstrate the SportWing and NV-2 inventions are solely mine. , The SportWing and NV-2 designs are mechanically accurate Copies of my invention as disclosed in the Specification and Art contained in the ‘294 application.

Attached is the ‘294 application dated April 7, 2007 showing the invention docket name as “Pixie”; the Product License showing ‘294 titled as “Pixie” on Exhibit A; <u>and a ‘294 planning document from Cequent dated February 21, 2008 titled “Pixie”.</u>

8. January 1, 2010. The former licensee cut off royalty payments and sales reporting to LGA on Jan. 1, 2010 and threatened litigation at the same time.

9. July 1, 2010. Risking Civil damages and Criminal charges at least nine individual employees and/or associates including Paul Caruso of Grosse Point Park, MI, Gail Rae Matheus of Salem, MI, Jason Matthew Dreger of Livonia, MI, Mitchell Auerback of Ft. Wayne, IN, Maurice R. Fredricks of Grand Heaven, MI, Todd Ireland of Coopersville, MI, Brett Kooistra of Grand Haven, MI and Sean Phillips of Huntsville, CANADA and Counsel for Cequent, David Cupar, filed a utility patent application on July 1, 2010, claiming my invention without listing me as the inventor. The utility application number is 2012/20000952 and is attached hereto and is currently in prosecution at the USPTO. Patent Counsel for Cequent at McDonald, Hopkins, David Cupar (note, the same attorney who drafted the license agreement in 2008) drafted and filed the ‘952 patent application along with the

signed Oaths without listing me as the Inventor. Cupar and the other inventors also filed an IDS with the USPTO but again failed to mention the ‘294 patent as a pertinent prior art reference. The declaration for a utility application with the USPTO states in part “I acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR 1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

Further, the declaration states “I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001 and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

Knowing full and well that I was the inventor of the subject matter claimed in the ‘952 application, Applicants and counsel risked fines and imprisonment clearly set out in the declarations they signed. Furthermore, counsel risked potential claims of malpractice by drafting and filing said application and for not providing the USPTO with all known prior art, i.e., my ‘294 application.

10. December, 2010. In early December, 2010, the former licensee through Tom Benson, Paul Caruso, Jeff Urian, Gail Rae Matheus and Jason Matthew Dreger, filed a lawsuit against LGA in Federal Court for rescission of the license and other damages. This lawsuit was prepared and filed by David Cupar, the very same individual who drafted the licensing agreement and the ‘952 patent application.

11. Between November 23, 2010 and December 15, 2010 the nine alleged inventors, Paul Caruso of Grosse Point Park, MI, Gail Rae Mathews of Salem, MI, Jason Matthew Dreger of Livonia, MI, Mitchell Auerback of Ft. Wayne, IN, Maurice R. Fredricks of Grand Heaven, MI, Todd Ireland of Coopersville, MI, Brett Kooistra of Grand Haven, MI and Sean Phillips of Huntsville, CANADA signed USPTO Inventor Oath’s that are on file with the USPTO and are attached hereto.

12. On January 28, 2012, the litigation was settled via the direct supervision of Federal Judge Schaffer, whereby both parties agreed that the license was terminated. The former licensee has continued selling counterfeit, infringing copies of my invention to this day.

13. On July 20, 2012 the former licensee though its counsel, David Cupar, requested dialog with LGA to re-license the ‘294 technology (Exhibit below). This is a direct admission from an expert that the technology is novel, that the technology was invented by Marty L. Williams and that the SportWing and NV-2 products are Copies of my invention.

14. On February 27, 2013 I filed my first Copying Affidavit without knowledge of the fraudulent ‘952 application.

15. I discovered the fraudulent ‘952 application in late May, 2013 while reviewing cross reference numbers linked to my ‘294 application, which the Examiner for ‘952 had posted.

15. I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of the Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Executed on March 31st, 2014 at Colorado Springs, Colorado.

____________________________________

Marty L. Williams

**NOTARY ATTESTATION**

STATE OF COLORADO )
) ss:
COUNTY OF EL PASO )

**SIGNED AND SWORN TO** before me this 5th day of June, 2014 personally appeared before me, Marty L. Williams, to me known to be the individual described in and who executed the within and foregoing instrument, and acknowledged that he signed the same as his free and voluntary act and deed, for the uses and purposes therein mentioned. Witness my official seal hereto affixed.

6/5/14

Marty L. Williams Date

REED FAIR
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144010787
MY COMMISSION EXPIRES MARCH 7, 2018

6-5-14
NOTARY PUBLIC in and for the State of Colorado,
residing at 2120 Naegel Rd Colorado Springs CO.
My appointment expires: 3-7-18

# Exhibit A

## Patent Filed 4-5-2007
## The Images below are the actual '294 Articles Introduced at SEMA 11-2007





# EXHIBIT B

## Note: the '294 Application is actually called "Pixie" in the attachment to the License Agreement.

**LICENSE AGREEMENT**

This License Agreement ("**Agreement**") is made this 2nd day of January, 2008 ("**Effective Date**") by and between Let's Go Aero, Inc. a Colorado corporation located at 3380 N. El Paso St., Suite G, Colorado Springs, Colorado ("**LGA**") and Cequent Towing Products, Inc., located at 47774 Anchor Court West, Plymouth MI 48170, on behalf of itself and its parent, subsidiaries, sister companies and any current or future related companies (collectively, "**Cequent**").

1. LGA has developed, will develop and will continue to develop and is the sole owner of all right, title and interest in and to such intellectual property, including certain patents, patent applications, complete designs and designs in process, that relate to the design, manufacture and sale of products specified on **Exhibit A,** as well as all future cargo management and towing products that will be added by the parties as a signed addendum to Exhibit A (collectively, the "**Products**"), all of which will be attached to this Agreement and made part of it in its entirety.
2. LGA will provide to Cequent written notification of all future cargo management and towing products that LGA designs, develops or continues to develop during the Term (as later defined), which writing will be signed by the parties and added to Exhibit A, as subsequent A-1, A-2, etc.
3. The intellectual property owned by LGA and related to the design, manufacture and sale of Products is collectively referred to in this Agreement as the "**Licensed Technology.**"
4. Cequent desires to acquire a license for the Licensed Technology, in order to manufacture, make, have made, use, distribute, offer to sell, import and sell Products utilizing the Licensed Technology, referred to in this Agreement as the "**Licensed Products.**"

The parties agree that the recitals above are binding on the Parties and further agree as follows:

**1. License Grant**

1.1 LGA grants to Cequent a worldwide limited exclusive license for the Licensed Technology and all improvements thereto developed, owned or controlled by LGA to make, manufacture, have made, use, import, offer for sale and sell the Licensed Products set forth on Exhibit A under Cequent trademarks or trade names or such other brands as Cequent may determine in its sole discretion, for a period beginning as of the Effective Date and ending December 31, 2009 (the "**Exclusive License**"). The Parties acknowledge and agree that should LGA develop or design a Product during the Term (as defined below), LGA will grant to Cequent a worldwide limited exclusive license as stated in this paragraph 1 for the new Licensed Product, which two year period will begin upon the execution of the signed addendum to Exhibit A and the exclusivity will end two years thereafter, which license will also be designated as the "Exclusive License" as the term is used throughout this Agreement.

1.2     Upon expiration of any Exclusive License period, LGA grants to Cequent a worldwide nonexclusive license for the Licensed Technology and all improvements thereto owned or controlled by LGA to make, manufacture, have made, use, import, offer for sale and sell the Licensed Products under Cequent trademarks or trade names or such other brands as Cequent may determine in its sole discretion, for a period beginning as of the expiration of any Exclusive License period through the expiration or cancellation of any patents (the "**Non-Exclusive Period**") covering the Licensed Technology and Products (the "**Non-Exclusive License**").   The Exclusive License(s) and the Non-Exclusive License(s) are collectively referred to in this Agreement as the "**License**".

1.3     Cequent shall have the right to grant sublicenses under this Agreement to third parties for the manufacture of the Licensed Product on behalf of Cequent, provided that Cequent requires such third party to enter into a nondisclosure agreement protecting the confidentiality of the Licensed Technology and the License.   For a two year period beginning upon the expiration of any Exclusive License period for Licensed Products and for a period not greater than the first two years of any Non-Exclusive period, should LGA solicit direct sales of Licensed Products, LGA agrees to purchase exclusively from Cequent all required parts to manufacture and assemble the Licensed Products at the lowest price that Cequent gives to any other customer.   All rights not specifically granted to Cequent under this Agreement shall be reserved to LGA.

**2.     Term & Termination**          Unless earlier terminated by Cequent, this Agreement will be effective as of the Effective Date or the date of execution by the parties of any written Addendum(s) to Exhibit A and shall expire simultaneously with the cancellation or expiration of the patents covering the Licensed Technology for the Licensed Products (the "**Term**").   Cequent shall have the right to terminate this Agreement without penalty or consideration of any kind.   LGA may terminate this Agreement only upon Cequent's failure to cure a material breach of the Agreement within 60 days after receipt of written notice of the material breach from LGA.

**3.     Royalties and Other Payments**

3.1     Within 30 days from the date of this Agreement, Cequent shall pay a $400,000 fee to LGA, which fee will include payment for the transition of existing Product sales to current customers from LGA to Cequent and services related to the commercialization and transition of the Products to Cequent.   Additionally, as further consideration for the License during the Term, Cequent will pay to LGA a royalty in the amount of 7% of the Net Sales Price for the Licensed Products, as sold by Cequent to its customers, except for a maximum of three customers specifically set forth in **Exhibit B** attached to this Agreement and made part of it in its entirety (the "Special Customers").   Cequent will pay to LGA a royalty in the amount of 5% of the Net Sales Price for the Licensed Products sold by Cequent to the Special Customers.   All Special Customers shall be mass-market retailers unrelated to Cequent, and shall be mutually agreed upon in writing by Cequent and LGA.   Cequent and LGA may amend Exhibit B, Special Customers by mutual written consent of Cequent and LGA, which consent will not be unreasonably withheld.   As used in this Agreement, "Net Sales Price" means Cequent's invoice price for the Licensed Product as sold independently as a stand alone product to third parties, exclusive of freight, packaging and delivery charges and sales or other taxes, sales incentives and commissions, rebates, returns and warranty related expenses and also excluding import or export duties shown on the invoice.

3.2     The Royalties shall be paid in US dollars, on or before the 30th day following the end of each calendar quarter (being the 30th day of January, April, July and October, respectively) of each year.

3.3 A report of all sales made during the quarter shall accompany the Royalties payment; however Cequent need not list the names of the customers, except for the Special Customers.

3.4 LGA shall have the right to conduct an audit of such sales no more than once per year. Such audit shall be made by an independent auditor, be made no sooner than after one week's notice and shall be conducted in such a manner as not to disrupt Cequent's business. If discrepancies amounting to more than 5% of the amount due are discovered, then Cequent shall bear the cost of the audit.

**4. Warranties** LGA represents and warrants that: (i) it is the sole and exclusive owner of the Licensed Technology; (ii) it has the right to grant the rights and licenses granted herein; (iii) that the royalty rates specified in paragraph 3.1 above are no less favorable than the royalty rates provided to any other future licensee of the Licensed Technology, (iv) that during the Non-Exclusive Period(s), no other licensee of the Licensed Technology will be charged a royalty rate less than 10.5% of the Net Sales Price and (v) as of the Effective Date, there are no threatened or pending actions, suits, investigations, claims or proceedings in any way relating to the Licensed Technology or the Licensed Products and there are no actions for infringement against LGA or Cequent with respect to items it manufactures and sells embodying the Licensed Technology anywhere in the world. In the event that the Licensed Technology shall be found to infringe upon the rights of a third party, LGA shall (i) find a suitable replacement, or (ii) design a suitable non-infringing substitute.

**5. Indemnification** LGA will indemnify Cequent and hold Cequent harmless against, any claims for loss, liability, damage or expenses (including, without limitation, reasonable attorneys' fees, court costs and costs of investigation) arising in connection with the manufacture, marketing, sale and use or warranty (express or implied) related to the Licensed Technology for Licensed Products manufactured by LGA and unmodified by Cequent, as well as infringement of patent(s), trademark(s) or other intellectual property rights owned or possessed by a third party and related to the Licensed Technology. Cequent will indemnify LGA and hold LGA harmless against any claims for loss, liability, damage or expenses (including, without limitation, reasonable attorneys' fees, court costs and costs of investigation) arising in connection with the manufacture, marketing, sale and use or warranty (express or implied) related to the Licensed Technology for Licensed Products manufactured by Cequent or a third party under the direction of Cequent and unmodified by LGA. In the event Cequent becomes aware of a third party's infringement of any rights of LGA with respect to the Licensed Technology, Cequent will immediately notify LGA in writing. If LGA chooses to bring suit against the allegedly infringing party, Cequent agrees to provide LGA with such assistance and cooperation as may be reasonably necessary in connection therewith. LGA will reimburse Cequent's reasonable costs associated with any such assistance, (including any legal costs), provided that such assistance was specifically requested by LGA. Should LGA determine that it will not bring suit against the allegedly infringing party within 60 days after receipt of notice of the alleged infringement, Cequent reserves the right to bring suit on its behalf.

**6**. **Governmental Approvals / Compliance** LGA will take all actions necessary to obtain approvals from the proper governmental authorities or agencies for all obligations and undertakings of LGA under this Agreement, if required, and must keep Cequent apprised of the status and approvals received. The parties will comply with any and all applicable laws, regulations and standards in force in the country of manufacture and sale, including those may relate to quotations, pricing, manufacture, labeling, transportation, importation, exportation, licensing, approval, performance and/or certification of the Licensed Product, and those relating to environmental matters, wages, hours and conditions of

employment, discrimination, occupational health/safety and such other laws, regulations and standards as may be applicable.

7. **Ownership** As between the parties, LGA will retain ownership of the Licensed Technology, and any improvements, modifications or enhancements made thereto by LGA. Any improvements, modifications or enhancements made to the Licensed Products or Licensed Technology by Cequent shall be owned by Cequent. LGA shall have the right to utilize the improvements, modifications or enhancements made by Cequent in the Licensed Products.

8. **Confidential Information** Either party may disclose confidential and/or proprietary information from time to time to the other party in order to further their business relationship. Each party agrees to maintain such disclosed information as confidential and not to use such information except to the benefit of the disclosing party and in furtherance of this Agreement. The parties agree that the terms and conditions of the Nondisclosure Agreement executed by the parties will apply to this Agreement in their entirety, nonwithstanding any expiration of the Nondisclosure Agreement.

9. **Notices** Any notice required to be given pursuant to this Agreement must be in writing and mailed by certified or registered mail, return receipt requested or delivered by a national overnight air courier service, to the party's address provided above. Notices will be considered to have been given three (3) business days after deposit in the mail or one (1) day after delivery to an overnight air courier service at the addresses provided above or to such other address as may be furnished by the recipient in writing to the other parties hereto.

10. **Limitation of Liability** IN NO EVENT WILL LGA OR CEQUENT BE LIABLE FOR LOST PROFITS, OR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, ARISING IN ANY WAY IN CONNECTION WITH THIS AGREEMENT. THIS LIMITATION WILL APPLY EVEN IF LGA AND CEQUENT HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

11. **Governing Law** This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the state of Colorado without regard to its conflicts of laws principles. Any action or proceeding brought by either party against the other party arising out of or related to this Agreement shall be brought exclusively in a state or federal court of competent jurisdiction located in the state of Colorado.

12. **Misc.** No waiver by either party of any default will be deemed as a waiver of any prior or subsequent default of the same or other provisions of this Agreement. If a court of competent jurisdiction hereof holds any provision invalid or unenforceable, such invalidity shall not affect the validity or operation of any other provision and such invalid provision will be deemed to be severed from the Agreement. Cequent may not assign the License granted hereunder except as specified in this Agreement without prior written consent of LGA which will not be unreasonably withheld. This Agreement will be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

13. **Entire Agreement**. This Agreement represents the entire understanding of the parties with respect to its subject matter and supersedes all previous representations, understandings or agreements, oral or written including any prior license agreements between the parties. Any amendment of this Agreement must be in writing. For purposes of the validity and enforcement of this Agreement, any

party's facsimile signature to the Agreement or signatures sent electronically via PDF format shall be considered original signatures.

The parties have caused this Agreement to be executed as of the Effective Date.

| "LGA" | "Cequent" |
|---|---|
| By:______________________ | By:______________________ |
| Print Name: Marty L. Williams | Print Name: Paul C. Caruso |
| Title: President & CEO | Title: VP New Business Development |

**EXHIBIT A**

**Name of Product / Patent No., Patent Pending**

1. **Pixie: 11/697294**
2. **Silent Hitch Pin: Patent No. 6,409,203---6,609,725---6,945,550---10/604805 (CamLok)**
3. **Gear Cage: 11/767166**
4. **Gear Deck: 11/160087---6,042,175---6,213,539—6,398,290---6,910,609**
5. **Gear Space: 6,042,175---6,213,539—6,398,290---6,910,609**
6. **Twin Tube: 09/788299**
7. **Juice Box: 11/160087**
8. **Gear Bed: 10/605776 (C-channel no-drill drop-in cargo management system for pickups. 2003 GMC Product of the Year award winner.)**

**EXHIBIT B**

**SPECIAL CUSTOMERS**

**5% Royalty**

**Target**

**WalMart**

**KMart**

agreements, oral or written including any prior license agreements between the parties. Any amendment of this Agreement must be in writing. For purposes of the validity and enforcement of this Agreement, any party's facsimile signature to the Agreement or signatures sent electronically via PDF format shall be considered original signatures.

The parties have caused this Agreement to be executed as of the Effective Date.

"LGA"

By: ______________________

Print Name: Marty L. Williams

Title: President & CEO

1-2-08

"Cequent"

By: ______________________ 1-4-08

Print Name: Paul C. Caruso

Title: VP New Business Development

**EXHIBIT A**

**Name of Product / Patent No., Patent Pending**

1. **Pixie: 11/697294**
2. **Silent Hitch Pin: Patent No. 6,409,203---6,609,725---6,945,550---10/604805 (CamLok)**
3. **Gear Cage: 11/767166**
4. **Gear Deck: 11/160087—6,042,175---6,213,539—6,398,290---6,910,609**
5. **Gear Space: 6,042,175---6,213,539- 6,398,290---6,910,609**
6. **Twin Tube: 09/788299**
7. **Juice Box: 11/160087**
8. **Gear Bed: 10/605776 (C-channel no-drill drop-in cargo management system for pickups. 2003 GMC Product of the Year award winner.)**

# EXHIBIT C

## ‘294 “2009 SEMA Best Engineered New Product”





Gail Rae Matheus Alleged Inventor                    Marty L. Williams



Marty L. Williams Invention

# EXHIBIT D

Attempt by previous Licensee and counsel, David Cupar, to relicense the '294 application. Applicant now wonders why there is any need to relicense when Cequent had a pending patent application? This letter is after the filing of the '952 application and after the termination agreement of the previous license.

McDonald Hopkins
A business advisory and advocacy law firm®

McDonald Hopkins LLC
600 Superior Avenue, East
Suite 2100
Cleveland, OH 44114

P 1.216.348.5400
F 1.216.348.5474

Direct Dial: 216.430.2036
E-mail: dcupar@mcdonaldhopkins.com

July 20, 2012

**Via E-mail Only (haskinsT@s-d.com)**

Thomas M. Haskins III, Esq.
Silver & DeBoskey
1801 York Street
Denver, CO 80206

Dear Mr. Haskins:

Cequent has learned that Marty Williams of Let's Go Aero, Inc. ("LGA") has in the past few weeks corresponded with Wal-Mart. Cequent also learned that LGA represented that a license agreement between LGA and Cequent has terminated, and that the license covered Highland Sportwing™ bike racks (Wal-Mart Part Nos. 550006140 and 550006142), which Cequent supplies to Wal-Mart.

LGA's correspondence implies that the termination of the license somehow ended Cequent's right to sell Sportwing™ bike racks to Wal-Mart. This is both false and misleading. LGA does not own any patent covering those bike racks. And while Cequent and LGA had a prior license agreement, which is now terminated, that termination does not prohibit, limit, or in any way affect Cequent's rights to manufacture and supply Sportwing™ bike racks to Wal-Mart or to any other business. Therefore, Cequent has every right to sell those bike racks to Wal-Mart.

Cequent demands that LGA immediately stop all such false and misleading statements to Wal-Mart and all other third parties. If LGA believes that it has some legal claim against Cequent based on its representations to Wal-Mart, then please let me know immediately. Also, Cequent is open to discussing a mutually beneficial business arrangement regarding LGA's patent application.

Sincerely,

David B. Cupar

**SportWing 2 bike carrier Copy of '294 Art: 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 17, 18, 20, 21 and 22**

 Fredricks Design, Inc.

# Cequent

## Pixie Bike Rack

### Ideation

prepared by:

Fredricks Design Inc.

21. Jan. 08

creative product solutions | www.fredricks.com

 Fredricks Design, Inc.

Cequent

# Bike Rack Concepts

creative product solutions | www.fredricks.com

21.Jan.08

Fredricks Design, Inc.
Concept 1
Cequent
1. Arms fold vertically when not in use
2. Wheel holders move independently to custom fit bikes 12-47”
3. Hooks attached to elastic straps are attached to lower bracket
4. Unit attaches to the 18” extension using a locking pin identical to the way the extension attaches to the hitch on the vehicle which allows for easy removal. (ref. image on page 3)
5. Easy flip-open latches allow for lengthening of the arms.
1.
2.
3.
4.
5.
creative product solutions | www.fredricks.com
21.Jan.08
2

Fredricks Design, Inc.
Concept 1
Cequent
creative product solutions | www.fredricks.com
21.Jan.08
3



Fredricks Design, Inc.
Concept 2
Cequent
1. Arms fold vertically when not in use
2. Wheel holders move independently to custom fit bikes 12-47" by pulling a spring loaded pin
3. Security straps are attached to lower bracket
4. Left button allows unit to rotate to a 90º storage position/Right button allows arms to come together or move outboard into use position.
5. Removal of pins allow for lengthening of the arms.
2.
1.
3.
5.
4.
creative product solutions | www.fredricks.com
21.Jan.08
4

 **Concept 2**

**Cequent**



 ## Concept 3

Cequent





Fredricks Design, Inc.

**Cequent**



Fredricks Design, Inc.
Strap and Extrusion Ideation
Cequent
1.14.08
creative product solutions | www.fredricks.com
21.Jan.08
8

Fredricks Design, Inc.

**Extrusion Ideation**

**Cequent**

 Fredricks Design, Inc.

**Brake Light Ideation**

Cequent

1-16-08
1-16-08

creative product solutions | www.fredricks.com

21.Jan.08

10



 Cequent

Initial Ideation
7.Jan.08

Fredricks Design, Inc.

Cequent

Current Rola Brand Hitch Mounted Bike Rack

cycle

creative product solutions | www.fredricks.com

21.Jan.08

12

Fredricks Design, Inc.

**Cequent**

Fredricks Design, Inc.

**Cequent**



ADJUSTMENT PIN DETAIL

ADJUSTMENT SLOTS

SPRING-LOADED BALL LOCKS

RELEASE

Fredricks Design, Inc. Cequent

RUBBER TIRE STRAP
CLAMP FOR EITHER A TUBE (ROUND OR SQUARE)
SOFT RUBBER CUSHION
PLASTIC MOLDED STRAP-CLEAT
INSERT ONTO THE END OF A TUBE
1·4·08

creative product solutions | www.fredricks.com 21.Jan.08 15

Fredricks Design, Inc.

Cequent

ADJUST LENGTH
1.7.08

creative product solutions | www.fredricks.com

21.Jan.08

16





# Cequent

## Pixie Bike Rack

### Ideation

prepared by:

Fredricks Design Inc.

29. Jan. 08

 # Bike Rack Concepts

Aesthetic and functional features can be mixed and matched between all three concepts shown

The first priority is to select the locking method for the arms and then the aesthetic elements to match

We can design flexibility into the arm's position:

- position for bike hauling (shown here)
- lock them both up vertically
- lock them both horizontal – pointing away from each other
- lock them both together, rotated either towards the driver's or passenger's side
- we can allow all these positions – or just give them 2 options

Lift up on the release lever to adjust the arm's position

This end piece could be a reflector

Fredricks Design, Inc. **Concept 2** Cequent

ROLA
ROLA
1.29.08

Buttons release the arms through the center of the "tube"

creative product solutions | www.fredricks.com 29.Jan.08 3

Fredricks Design, Inc.

**Concept 3**

Cequent

Push the top button to release the arms
1.29.08

creative product solutions | www.fredricks.com

29.Jan.08

4

 Fredricks Design, Inc.
Concept 1

Cequent

## Nesting Arms:

creative product solutions | www.fredricks.com

29.Jan.08

5

  



Fredricks Design, Inc.

# Cequent

## Rola V2 (Pixie)

## Bike Layout

## and

## Lock Options

prepared by:

Fredricks Design Inc.

February 21, 2008

creative product solutions | www.fredricks.com

Fredricks Design, Inc.

## 4 Bike Layout – 4 Arms

**Cequent**

Please mark up what information you would like to see with this layout

Fredricks Design, Inc.

## 4 Bike Layout – 2 Arms

**Cequent**

Please mark up what information you would like to see with this layout

## Non-integrated Lock Options

Loop integrated into the hub casting

Loop for lock is part of the die cast piece

Loop integrated into the extension

Through hole in the insert allows a lock cable to be passed through. A plastic sleeve could be added to make it look aesthetically cleaner and make it easier to pass the cable through.

## Non-integrated Lock Options

Plastic injection molded loop slid down and secured on the arm extrusion

Can be designed to orient for best access and not crashing to opposite arm

Suggest using chain loops on the hitch

Create a cable loop in the wheel holder bracket

Weld a tab on the insert

## Integrated Lock Options

Cable housed in the arms

The cable would lock into the insert
When not in use the cable would slide into the arm

Cable housed in the insert

The cable would lock into the insert

Frame Lock

We would need multiple frame locks that are extendable for the 4-bike version
This could also be used to stabilize 4 bikes

Fredricks Design, Inc.

## Integrated Lock Options

Cequent

Wheel Claw

We can vary the design of this concept

Lock integrated into the pad

2.20.08

creative product solutions | www.fredricks.com

6



Fredricks Design, Inc.

## Securing Multiple Bikes

Cequent

2 straps for 2 bikes

We are going to want to evaluate a mock-up to determine the best method for securing 4 bikes to the rack

Here are a couple of options we've discussed:

Asymmetrical Strap

Outer "arm" of strap is longer to accommodate 2nd bike on arm